**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: September 24 2007**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 07-31744 |
| | ) | |
| George L. Lang, | ) | Chapter 7 |
| Renee L. Lang, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(3) [Doc. # 17] and Debtors' response [Doc. # 20]. A hearing was held that Debtors, their counsel and counsel for the UST attended in person and at which the parties had the opportunity to present testimony and other evidence in support of their respective positions. The court has jurisdiction over this case under to 28 U.S.C. §1334 and the general order of reference entered in this district. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(A). Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtors' Chapter 7 case unless they convert the case to a case under Chapter 13.

### BACKGROUND

Debtors are married and have two dependent children of Renee Lang, ages four and ten, living in their home. George Lang has one dependent child who does not live with them. George Lang is employed

at Whirlpool where he has worked for the past sixteen years and Renee Lang is employed at Kohl's. On April 30, 2007, they filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts. Debtors' Schedule D shows total secured debt in the amount of $101,330, including debt secured by their home, a 2002 Ford van and a 2002 Ford Taurus. Their bankruptcy schedules also show unsecured nonpriority debt, consisting entirely of credit card debt, in the amount of $48,618 and no unsecured nonpriority debt.[1]

Debtors' Schedule I shows total monthly income after payroll deductions in the amount of $4,420, which amount includes a deduction for child support payments paid by George Lang and an addition for those received by Renee Lang. Debtors also indicate in their means test calculations included on Form B22A that their current monthly income is $4,420. "Current monthly income" is defined as their average monthly income from all sources during the six-month period before filing their petition. 11 U.S.C. § 101(10A). Although both Debtors enjoyed stable income during the six months before filing, they both testified that their work hours have recently been reduced by approximately eight hours per week. George Lang testified that his hours had been reduced during the past six weeks as a result of "the worst year" that he has seen at Whirlpool since 1991. Due to the reduction in work hours, he earns approximately $400 per month less than he had been earning at the time Debtors filed their petition. Although Renee Lang also testified that her hours had recently been reduced, she knew no reason for the reduction and provided no indication whether the reduction was temporary or whether it is a long term reduction in work hours. As such, the court gives little or no weight to the fact that her hours were reduced for some undisclosed period of time in projecting Debtors' future income for purposes of the instant motion. However, the court credits George Lang's testimony and finds that their total monthly income after payroll deductions is approximately $4,020. Debtors also received net income tax refunds in the amount of approximately $2,200 for 2006.

Debtors' original Schedule J filed with their petition shows total monthly expenses in the amount of $3,076, which includes a mortgage expense of $638, a food expense of $800, a car payment of $275 and payments for alimony, maintenance and support in the amount of $371.[2] In response to the instant motion to dismiss, Debtors filed an amended Schedule J that shows their monthly expenses have increased by over

---

[1] Debtors' Schedule E shows Kathy Lang as a creditor holding an unsecured priority claim under a child support order but lists the amount owed as zero.

[2] As indicated, Debtors' Schedule I shows a payroll deduction for George Lang for child support in the amount of $285.48. Debtors' original and amended Schedule J show on line 14 a monthly expense of $371.37 under the category of "[a]limony, maintenance and support paid to others." The record does not address what this Schedule J expenses is, or when it ends if it is alimony. The court thus defers to Debtors' Schedule J with respect to these obligations for purposes of this motion. If it is alimony and will terminate in the next 36 months, that may also be a factor in any Chapter 13 case.

2

$1,400. [Doc. # 21]. While the court credits testimony that certain expenses were mistakenly omitted on the original Schedule J, it does not believe that over $1,400 in expenses were mistakenly omitted. Nevertheless, Debtors' amended Schedule J shows that their water, sewer and telephone expenses have decreased but that they omitted expenses for cable, internet and trash, resulting in a net increase in utility expenses of $37. The court finds that this amount should be added to the original Schedule J expenses as well as the following expenses: $56 for home maintenance, $46 for life insurance, and $105 for prescriptions. The court finds these expenses were mistakenly omitted from Debtors' original Schedule J. Debtors also omitted their car payment on their second vehicle, which is included on their amended Schedule J in the amount of $293. However, since filing their bankruptcy petition, Debtors have reaffirmed the debt on that vehicle and, in doing so, have renegotiated the terms of their loan such that their payment has been reduced to $184 per month. With these adjustments, Debtors' average monthly living expenses total $3,504.

Debtors also testified that they both smoke and have, therefore, added $350, the cost of their cigarettes, to their amended Schedule J. They also add monthly expenses of $65 for haircuts and $75 for school supplies and lunches and increased expenses for recreation from $85 to $158, for clothing from $50 to $106, and for medical expenses from $35 to $280. Renee Lang testified that their recreation expense represents funds spent on weekends taking their children out to eat and for family entertainment. She also testified that the $280 medical expense represents payments on prepetition medical expenses. Debtors did not include their medical providers as creditors on their bankruptcy schedules because, according to Renee Lang, they wanted to assure continuity with their current providers. Since their petition has been filed, Debtors have incurred additional medical expenses of between $1,500 and $2,000.

Debtors' Form 22A calculating the means test shows that their annualized current monthly income at the time of filing their case was $68,001.60, just under the applicable median family income of $68,890.00. As a result, no presumption of abuse arose in this case. *See* 11 U.S.C. §§ 101(10A) and 707(b)(2)(A). Rather, the UST filed a timely motion to dismiss for abuse under § 707(b)(3), arguing that the totality of the circumstances are such that Debtors have the ability to repay at least a portion of their unsecured debt.

## **LAW AND ANALYSIS**

This case must be decided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, ("BAPCPA" or "the Act") because it was filed on April 30, 2007, after the effective date of the Act. Where debts are primarily consumer debts, the court may, after notice

3

and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. For cases in which the presumption of abuse does not arise or is rebutted, Congress incorporated this judicially created construct in § 707(b)(3) by requiring a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA, Congress has clearly lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). In the court's view, the change in standards from "substantial abuse" to "abuse" makes a material difference in this case.

The UST contends that the totality of the circumstances show that Debtors have the ability to repay a significant portion of their unsecured debt. Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27. "Courts generally evaluate as a component of a debtor's ability to pay whether there would be sufficient income in excess of reasonably necessary expenses to fund a Chapter 13 plan." *Mestemaker*, 359 F.3d at 856 (citing *In re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004)).

The court finds that Debtors have the ability to repay a meaningful portion of their unsecured debt. Although both Debtors testified that their hours have been cut recently, there is no indication that their employment is not generally stable. As discussed above, Debtors' adjusted monthly income totals $4,020 and their adjusted monthly expenses, total $3,504, leaving a balance of over $500 that could potentially be paid to unsecured creditors. While these figures include a monthly medical expense of $35 as stated in their original Schedule I, it does not include the additional $245 that was added to their amended Schedule J and

4

that Renee Lang testified is being paid on medical expenses incurred prepetition that are subject to discharge in a Chapter 7 case. As one court observed "by voluntarily paying [select] unsecured prepetition creditors while paying other creditors nothing and seeking to enjoy a discharge with respect to the latter debts, [Debtors] are attempting to circumvent and/or to subvert the distribution scheme set forth at 11 U.S.C. § 726." *See In re Wray*, 136 B.R. 122 (Bankr. W.D. Pa. 1992) (finding objectionable continued payments by debtors on select dischargeable debts and dismissing case as substantial abuse); *see also In re Attanasio*, 218 B.R. 180, 222-25 (Bankr. D. Ala. 1998) (citing an exhaustive list of cases where substantial abuse was found where debtors' stated expenses on their bankruptcy schedules included payments to unsecured, prepetition creditors). Nevertheless, Debtors have also incurred post-petition medical expenses of between $1,500 and $2,000. Payment of this debt in the amount of $100 per month, which the court finds reasonable, will result in the post-petition debt being satisfied in fifteen to twenty months.

The court has also omitted from the above calculation another $649 in expenses added by Debtors to their amended Schedule J, including expenses for cigarettes, haircuts, school supplies, clothing, and recreation. The court finds these expenses excessive. The court will not, however, engage in the task of determining the proper amounts Debtors should spend on each expense category. Rather, the court takes the approach suggested in *In re Mars*, 340 B.R. 844 (Bankr. W.D. Mich. 2006), wherein the court explained:

> Too many courts have fretted over whether a debtor's budget should include an allowance for cigarettes or whether the debtor is driving too expensive of a car. Far more important is consideration of what is to be the fair division of a debtor's future income between his creditors and himself. A debtor should not be permitted to live extravagantly at his creditors' expense. However, it should be up to the debtor to decide how he spends his share once the appropriate allotment has been made. For example, a debtor should not be prohibited from smoking provided the debtor makes compensating adjustments elsewhere in his or her budget.

*Id.* at 850. The court finds that the adjusted expenses of $3,504 described above, plus $100 as payment for medical expenses already incurred post-petition, plus $200 for other miscellaneous expenses, for total expenses of $3,804 is a more than fair allotment of Debtors' future income to be used for the ongoing monthly support and maintenance of Debtors and their dependents. In so finding, the court has considered the fact that Debtors' scheduled expenses already include a generous $800 monthly food budget and modest amounts budgeted for entertainment and clothing. The court believes that total average monthly expenses in the amount of $3,804 (compared to the $3,076 in their original Schedule J) will allow Debtors to make compensating adjustments in order to cover all of their reasonable expenses in the manner that best suits them. *See* UST Exs. 1 and 2 (Part D).

5

In light of the foregoing, it is clear that Debtors are able to repay a significant portion of their pre-petition unsecured debt. Debtors have adjusted monthly income of $4,020. With the adjustment to Debtors' expenses as discussed above, the court finds that approximately $216 per month could be paid into a Chapter 13 plan, or $7,776 over thirty six months, a period that coincides with the applicable commitment period of a Chapter 13 plan for below median income debtors such as the Langs. *Cf.* 11 U.S.C. § 707(b)(2)(A)(for purposes of applying presumption of abuse, as adjusted effective April 1, 2007, under 11 U.S.C. § 104, monthly disposable income of more than $182.50 to fund a 60 month plan is an abuse). As Debtors' schedules show unsecured debt in the amount of $48,618, an amount less than the limits for eligibility for relief under Chapter 13, and no unsecured priority debt, unsecured creditors may receive a dividend of approximately 16% under a Chapter 13 plan, or more if claims are not filed by all creditors as frequently occurs. *See In re Behlke,* 338 F.3d 429, 437 (6th Cir. 2004) (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors).[3] In addition, in fifteen to twenty months, Debtors post-petition medical expenses will be paid and, assuming additional expenses over and above the amount otherwise budgeted for medical expenses are not incurred, another $100 per month could be added to payments to unsecured creditors. Finally, Debtors received income tax refunds for 2006 in the net amount of approximately $2,200. Although future tax refunds may be somewhat smaller due to George Lang's work hours being decreased by eight hours per week, given the ages of their children and the reaffirmation of the home mortgage debt, Debtors are likely to continue to receive a sizeable tax refund that may also be applied to their unsecured debt in a Chapter 13 plan.

The court finds that, based on these facts, granting Debtors relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the totality of their financial circumstances.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. Section 707(b)(3) [Doc. # 17] be, and hereby is, **GRANTED**. Debtors are allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case or the case will be dismissed by separate order of the court.

---

[3] Renee Lang estimated that they had $2,000 to $3,000 in prepetition medical bills that they chose not to list on Schedule F. If they have continued to pay these prepetition medical providers as she indicated since the April 30, 2007, filing of this case, that amount would be significantly reduced by now. In any event, scheduling these creditors and adding the total pre-petition debt to Schedule F would not change the outcome of the motion as the predicted percentage available to pay unsecured creditors absent inclusion of tax refunds would drop to approximately 15% over 36 months.

6